1   Mark Punzalan (State Bar No. 247599)
2   mpunzalan@finkelsteinthompson.com
    **FINKELSTEIN THOMPSON LLP**
3   100 Bush Street, Suite 1450
    San Francisco, CA 94104
4   Telephone: (415) 398-8700
    Facsimile: (415) 398-8704
5

6   Additional Counsel Listed on Signature Page

7

**FILED**

NOV - 9 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

PJH

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**CV 11        5457**

GARY RALL and MARION RALL, On Behalf
of Themselves and All Others Similarly
Situated,

Civil Action No.

                    Plaintiffs,

        vs.

DIAMOND FOODS, INC.,  MICHAEL
J. MENDES, and STEVEN M. NEIL

                    Defendants.

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

        Plaintiffs Gary Rall and Marion Rall ("Plaintiffs"), by their undersigned attorneys, allege the

following based upon personal knowledge as to their own acts, and information and belief as to all other

matters, based upon, among other things, the investigation conducted by and through their attorneys,

which included, among other things, a review of the public documents and announcements made by the

Defendants, Securities and Exchange Commission ("SEC") filings, press releases, news articles, and

analyst reports regarding Diamond Foods, Inc. ("Diamond" or the "Company").  Plaintiffs believe that

substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

FAXED

## NATURE OF ACTION

1.      This is a securities class action brought on behalf of all persons who purchased the publicly traded securities of Diamond Foods, Inc. during the period between April 5, 2011 and November 1, 2011, inclusive (the "Class Period") against Diamond and certain of its officers and directors including President, Chief Executive Officer, and Chairman Michael J. Mendes and Executive Vice President and Chief Financial and Administrative Officer Steven M. Neil.

2.      Defendant Diamond is a packed foods company focused on snack foods.  Diamond is the owner of brands such as Kettle chips, Emerald nuts, Pop Secret popcorn, and Diamond of California nuts.

3.      For most of its history, Diamond was a growers' cooperative.  In 2005, Diamond became a publicly traded company, and broadened its focus to include the acquisition of successful snack food brands.

4.      On April 5, 2011, Diamond announced that it had entered into a material definitive agreement with the Procter and Gamble Company ("P&G") to acquire P&G's Pringles snack business in late 2011.

5.      During the Class Period, Defendants issued materially false and misleading statements regarding the Company's accounting procedures for payments to walnut growers and failed to disclose expenses that should have been realized for the fiscal year ending July 31, 2011.  These material misrepresentations and omissions resulted in artificially inflated prices during the Class Period for Diamond shares.  As a result of Defendants' false statements, Defendant's shares traded at artificially inflated prices during the Class Period, reaching a high of $92.47 per share on September 20, 2011.

6.      On November 1, 2011, Diamond announced that it was launching an investigation into accounting irregularities regarding certain payments to walnut growers, and postponing the acquisition of the Pringles snack business from P&G until sometime in the first half of 2012.

2

7.     On November 2, 2011, Diamond shares fell 17.8%, closing at $52.76 per share, with unusually heavy trading volumes.

8.     Shares in the Company fell to $51.61 on November 3, 2011, and to $46.32 on November 4, bringing total losses for the trading week to 27.8%.

9.     Defendants knew but concealed from the investing public that certain payments to walnut growers should have been realized as expenses for the fiscal year ending July 31, 2011.

10.     Defendants also knew that their failure to accurately report expenses would artificially inflate its profit margin.

11.     As a result of Defendants' false statements and omissions, Diamond shares traded at artificially inflated prices during the Class Period.   As the truth was revealed about Diamond's accounting irregularities, the Company's stocks plummeted.

## JURISDICTION AND VENUE

12.     This action arises under Section 10(b) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged fraud or the effect of the fraud occurred in this District.  In addition, many of the acts and practices made in furtherance of Defendants' scheme and complained of herein occurred in substantial part and/or had an effect in this District.  Further, Defendants were, during the Class Period, located in, or conducted substantial business within this District.

3

14.     In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone and Internet communications.

## PARTIES

15.     Plaintiffs are residents of Litchfield Park, Arizona.  Plaintiffs purchased shares of Diamond Foods during the Class Period at artificially inflated prices and were damaged thereby, as reflected in the certifications filed herewith.

16.     Defendant Diamond is a corporation incorporated in Delaware. During the Class Period, Diamond's principal executive offices were located at 600 Montgomery Street, 17th Floor, San Francisco, California 94111.  Diamond produces and sell nuts, including walnuts, almonds, pine nuts, and pecans.  Diamond also sells other packaged snack foods.  The Company's shares trade on the NASDAQ under the ticker symbol DMND.

17.     Defendant Michael J. Mendes ("Mendes") has served as Diamond's President and Chief Executive Officer since 1997.  He is also the Chairman of the Board of Directors.

18.     Steven M. Neil ("Neil") has served as Diamond's Executive Vice President and Chief Financial and Administrative Officer since 2008.

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the securities of Diamond during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable. As of August 31, 2011, Diamond had 22,011,196 shares of common stock outstanding, owned by

4

1    thousands of shareholders.  While the exact number of Class members is unknown to Plaintiffs at this

2    time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are

3    thousands of members in the proposed Class.  Record owners and other members of the Class may be

4    identified from records maintained by Diamond Foods or its transfer agent and may be notified of the

5    pendency of this action by mail, using the form of notice similar to that customarily used in securities

6    class actions.

7

8          21.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of

9    the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

10    complained of herein.

11

12          22.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and

13    has retained counsel competent and experienced in class and securities litigation.

14          23.     Common questions of law and fact exist as to all members of the Class and predominate

15    over any questions solely affecting individual members of the Class.  Among the questions of law and

16    fact common to the Class are:

17

18          (a)     whether the federal securities laws were violated by Defendants' acts as alleged

19    herein;

20          (b)     whether statements made (or omissions) by Defendants to the investing public

21    during the Class Period misrepresented (or omitted) to state material facts about the business, operations

22    and management of Diamond; and

23

24          (c)     to what extent the members of the Class have sustained damages and the proper

25    measure of damages.

26          24.     A class action is superior to all other available methods for the fair and efficient

27    adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

28

damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

25.     Diamond was founded in 1912 as Diamond Walnut Growers, Inc., a member-owned California agricultural cooperative association.  The Company remained focused almost exclusively on nuts until 2005.  In that year, Diamond incorporated in Delaware as Diamond Foods, Inc., issued an IPO, and began trading on the NASDAQ.

26.     The Company's co-op members received over half of the stock issued in the IPO.  They also entered into output contracts with Diamond to sell the Company all of their nuts for 3, 5, or 10 year terms.

27.     Upon going public, Diamond broadened its focus to include the acquisition of snack food brands such as Kettle chips and Pop Secret popcorn, in a bid to reshape itself as a global snack food conglomerate.  In April 2011, Diamond announced that it had reached an agreement with P&G to purchase the Pringles brand.

28.     Under the terms of the deal, P&G shareholders would receive approximately 29 million shares of Diamond stock, giving P&G shareholders a 57% interest in Diamond, and leaving prior shareholders with 43%.

### Diamond's Relationship With Walnut Growers

29.     Diamond customarily paid its walnut growers about a third of the crop's estimated value within two weeks of delivery, usually in November.  A small payment would follow in February of the following year.  The bulk of the payment took place in August of the following year.

CLASS ACTION COMPLAINT

30.     Diamond would realize these payments and/or estimates thereof as expenses for the fiscal year ending during the summer following the fall in which the crop was delivered.  So, for example, the payments made in November 2007, February 2008, and August 2008 for the fall 2007 crop should have been realized as expenses for the fiscal year ending in July 2008.

31.     Diamond customarily maintained output contracts with growers, agreeing to purchase their entire crops.  Diamond paid somewhat less than market price for the crops in good years, when demand was high.  This was offset by the fact that Diamond paid somewhat above market price in leaner years, when demand was low.

### Diamond's "Momentum Payments"

32.     In recent years, consumer demand for walnuts as a healthy snack has skyrocketed.  This left some of Diamond's growers pinched and unhappy with their contracts.

33.     The trend culminated with payments for the fall 2010 crop coming in "woefully short" of market price, according to Jonathan Field, the general manager of the Walnut Bargaining Association.

34.     In early September 2011, Diamond made what it called "Momentum Payments" of 30 to 40 cents per pound of walnuts to its growers.  Diamond stated that these unusual payments were for the upcoming 2011 crop.

35.     However, many of Diamond's growers believed that the payments were really an attempt to bring payment for the 2010 crop closer to market price, thereby assuaging growers' concerns over the growing gap between their revenues and market rates.

36.     This belief was not mere speculation.  According to Mark Roberts ("Roberts"), of the Off Wall Street Consulting Group, Diamond referred to its August payment for the previous year's crop as the "final" payment for that crop through the 2009 growing year.  However, for the 2010 growing year, the August 2011 payment was not marked as "final."

CLASS ACTION COMPLAINT

37.     Roberts also spoke to a grower who questioned Diamond's head of field operations directly about the September 2011 Momentum Payments, asking whether they were further payments for the 2010 crop.  The head of field operations replied in the affirmative.

38.     Most tellingly, Diamond made Momentum Payments to growers who have ended their contracts with Diamond, *and who will not be selling Diamond their 2011 crops*.  This completely undercuts Diamond's statements that the Momentum Payments were advances on the 2011 crop.

### The Effect of the Momentum Payments on Diamond's Financials

39.     According to the *Wall Street Journal's Heard on the Street* blog, the September 2011 Momentum Payments totaled an estimated $50 million.

40.     Since the Momentum Payments were, in reality, payments for the 2010 crop, Diamond should have realized them as expenses for the fiscal year ending July 31, 2011.

41.     Diamond's failure to do so resulted in an estimated 50% overstatement of the Company's operating income for that fiscal year, and an estimated 20% overstatement of the Company's gross margin.

42.     Diamond's overstatement of its income and margins resulted in an artificially inflated share price.  Indeed, the Company's shares skyrocketed from $78.23 to $87.30 immediately after the Company released its Form 10K, which included the overstatements, on September 15, 2011.  The Company's shares continued their precipitous climb over the next few days, topping out at $92.47 on September 20, 2011.

### Defendants' False and Misleading Statements Issued During the Class Period

43.     On April 5, 2022, Diamond Foods issued a joint press release with P&G entitled "Diamond Foods to Merge P&G's Pringles Business into the Company."  This press release contained representations about the timing and nature of Diamond's planned acquisition of P&G's Pringles line:

SAN FRANCISCO, CA and CINCINNATI, OH (April 5, 2011) — Diamond Foods, Inc. (NASDAQ: DMND) and The Procter & Gamble Company (NYSE: PG) today announced the signing of a definitive agreement to merge the Pringles business ("Pringles") into Diamond Foods in a transaction valued at $2.35 billion.

****

**Financial Benefit for Diamond Foods Shareholders**

Assuming Pringles had been owned for all of fiscal year 2011, the combined company would be expected to deliver the following estimated financial results on a pro forma basis for fiscal year 2011:

- Net sales of approximately $2.4 billion;

- Double-digit accretion to earnings per share (EPS), excluding merger and integration costs;

- Estimated earnings before interest, taxes, depreciation and amortization (EBITDA), including $25 million in synergies, of approximately $398 million to $410 million.

For fiscal year 2012, Diamond anticipates strong growth in its core business, with EPS of $2.85 to $2.98 per share on a standalone basis, an increase of 15 percent to 20 percent from the midpoint of its fiscal 2011 guidance range, which represents a 30 percent increase over 2010 EPS.

Combined results for Diamond plus the Pringles business for fiscal year 2012 will depend on the actual closing date of the transaction. Assuming the transaction closes by the end of calendar 2011, seven months of Pringles performance would be included in the following expected results:

- Fiscal 2012 total net sales are estimated to be approximately $1.8 billion;

- Fiscal 2012 EPS, before costs associated with the transaction and integration, are estimated to range from $3.00 to $3.10 per share, which reflects EPS accretion of 12 to 15 cents per share

The transaction is expected to significantly increase cash flow and accelerate the de-levering of Diamond's balance sheet. Pro forma leverage at closing is projected to be below four times EBITDA, and projected to drop below three times at the end of fiscal 2013. Cash flow after brand investments and capital expenditures is expected to approach $200 million in the first full fiscal year after closing the merger.

****

**Transaction Details**

CLASS ACTION COMPLAINT

P&G expects the separation to occur through a "split-off" transaction in which P&G shareholders can elect to participate in an exchange offer to exchange P&G shares for shares of Diamond. Under the terms of a split-merge agreement, P&G will establish a separate entity to hold the Pringles business, which will be distributed to electing P&G shareholders in a tax-efficient transaction with a simultaneous merger with Diamond. This "Reverse Morris Trust" transaction has been approved by the boards of both companies. We expect to finalize the details of this transaction in the coming months.

The value of the transaction is $2.35 billion, comprising $1.5 billion in Diamond common stock, consisting of 29.1 million shares for approximately 57 percent of the outstanding shares of the combined company, and the assumption of $850 million of Pringles debt. Diamond's existing shareholders would continue to own approximately 43 percent of the combined company.

The parties have also agreed to a collar mechanism that would adjust the amount of debt assumed by Diamond based upon Diamond's stock price during a trading period prior to the commencement of the Exchange Offer. The amount of debt to be assumed by Diamond could increase by up to $200 million or decrease by up to $150 million based on this adjustment mechanism.

Diamond expects to incur one-time costs of approximately $100 million related to the transaction over the next two years. P&G also will provide Diamond transition services for up to 12 months after closing.

**Leadership, Approvals and Timing**

The combined business will be managed by Diamond's executive team and board of directors, led by Michael J. Mendes, Chairman, President and CEO. The company's headquarters will remain in San Francisco, California.

The transaction is subject to approval by Diamond shareholders and the satisfaction of customary closing conditions and regulatory approvals. The transaction is expected to be completed by the end of calendar 2011.

44.     On June 2, 2011, Diamond Foods filed a Form 10-Q with the SEC which described its accounting procedures and set forth estimated commodity costs:

We have entered into long-term Walnut Purchase Agreements with growers, under which they deliver their entire walnut crop to us during the Fall harvest season and we determine the purchase price for this inventory by March 31, or later, of the following year. This purchase price will be a price determined by us in good faith, taking into account market conditions, crop size, quality, and nut varieties, among other relevant factors. Since the ultimate price to be paid will be determined subsequent to receiving the walnut crop, we must make an estimate of price for interim financial statements. Those estimates may subsequently change and the effect of the change could be significant. *In the three months ended April 30, 2011, the Company revised its estimate for expected*

CLASS ACTION COMPLAINT

*commodity costs which resulted in a pre-tax decrease in cost of sales of approximately $1.5 million for sales recognized in the first six months of fiscal year 2011. In the three months ended April 30, 2010, the Company revised its estimate for expected commodity costs which resulted in a pre-tax decrease in cost of sales of approximately $1.1 million for sales recognized in the first six months of fiscal year 2010.* (emphasis added)

45.     The 10-Q included certifications from both Mendes and Neil.

46.     Mendes' certification stated:

I, Michael J. Mendes, certify that:

    1.  I have reviewed this quarterly report on Form 10-Q for the quarter ended April 30, 2011 of Diamond Foods, Inc.;

    2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

    4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.    Neil's certification was substantially similar.

48.    On October 3, 2011, Diamond Foods issued a press release titled "Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance. The Company, in relevant part, stated:

San Francisco, CA (October 3, 2011) – Diamond Foods, Inc. (NASDAQ:DMND) Diamond made a pre-harvest momentum payment to walnut growers in early September, prior to the delivery of the fall walnut crop to reflect the fiscal 2012 projected market environment. The payment is accounted for in fiscal 2012 cost of goods sold and is reflected in the guidance provided by the company on September 15, 2011.

Diamond reaffirms the guidance provided in its press release dated September 15, 2011, which reflects not only higher commodity costs expected in fiscal 2012, but also recent retail price increases taken for its products. Diamond believes it has an ample walnut supply for both the retail and value-added, non-retail business.

**Financial Outlook**

For the first half of fiscal 2012, for Diamond on a standalone basis, we expect total net sales of between $540 to $560 million, an increase in advertising investment of 20-25% over the first half of 2011 and non-GAAP EPS ranging from $1.65 to $1.75. We expect the distribution of earnings between Q1 and Q2 to be similar to last year's first half.

For the full year of fiscal 2012, we expect non-GAAP EPS to range from $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December and reflects:

12

CLASS ACTION COMPLAINT

- Net sales of between $1.85 billion and $1.95 billion;

- An estimated operating margin of between 11.5 percent and 12.0 percent;

- Interest expense of between $40 million to $45 million;

- An effective tax rate of 27 percent to 30 percent;

- Outstanding share count of 42 million to 43 million;

- Capital expenditures of $75 million to $85 million;

- EBITDA of $300 million to $310 million;

- Transaction and integration costs of $150 million associated with the Pringles transaction over the next two years.

49.     On September 15, 2011, Diamond issued its Form 10-K, reporting its financial results for the fiscal year ending July 31, 2011. The Company reported net income of $50.2 million, or $2.22 per diluted share. The Company reported gross profit of $251.1, and revenues of $965.9 million, for a gross profit margin of 25.9%. The Company reported operating income of $92.9 million.

50.     The Form 10-K described the Company's accounting procedures:

Our financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of our assets, liabilities, revenues and expenses. We base our estimates on historical experience and various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates. Our critical accounting policies are set forth below.

*Revenue Recognition.* We recognize revenue when persuasive evidence of an arrangement exists, title and risk of loss has transferred to the buyer (based upon terms of shipment), price is fixed, delivery occurs and collection is reasonably assured. Revenues are recorded net of rebates, introductory or slotting payments, coupons, promotion and marketing allowances. The amount we accrue for promotion is based on an estimate of the level of performance of the trade promotion, which is dependent upon factors such as historical trends with similar promotions, expectations regarding customer and consumer

CLASS ACTION COMPLAINT

participation, and sales and payment trends with similar previously offered programs. Customers have the right to return certain products. Product returns are estimated based upon historical results and are reflected as a reduction in sales.

51.    The Form 10-K again described Diamond Foods' policy for determining the price to be paid to growers:

> We have entered into long-term Walnut Purchase Agreements with growers, under which they deliver their entire walnut crop to us during the Fall harvest season and we determine the minimum price for this inventory by March 31, or later, of the following calendar year. ***The final price is determined no later than the end of the Company's fiscal year.*** This purchase price will be a price determined by us in good faith, taking into account market conditions, crop size, quality, and nut varieties, among other relevant factors. Since the ultimate price to be paid will be determined subsequent to receiving the walnut crop, we must make an estimate of price for interim financial statements. Those estimates may subsequently change and the effect of the change could be significant. (emphasis added)

52.    The Form 10-K included a certification by Mendes, which stated:

> I, Michael J. Mendes, certify that:

> 1. I have reviewed this annual report on Form 10-K of Diamond Foods, Inc.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide

14

reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

      5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

53.    Neil signed a nearly identical certification.

54.    Mendes and Neil also signed the following joint certification:

I, Michael J. Mendes, President and Chief Executive Officer of Diamond Foods, Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1) the Annual Report on Form 10-K of the Company for the fiscal year ended July 31, 2011 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company . . .

I, Steven M. Neil, Chief Financial and Administrative Officer of Diamond Foods, Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

CLASS ACTION COMPLAINT

(1) the Annual Report on Form 10-K of the Company for the fiscal year ended July 31, 2011 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

55.     Mendes and Neil signed these certifications despite the fact that the Momentum Payments violated the Company's stated policy of setting the final price for the previous year's walnut crop no later than the end of the fiscal year and were an expense that should have been included in fiscal year 2011.

56.     As a result of this violation, the Momentum Payments were not counted on the Company's balance sheets in the Form 10-K, resulting in the Company's gross margin being overstated by about 20% (at 25.9%, instead of approximately 20.8%).

57.     This also resulted in the Company's operating income being overstated by more than 50% (at $92.9 million instead of approximately $42.9 million).

58.     Diamond's misrepresentations and omissions were part of a scheme to solve two problems facing the company. First, many of Diamond's growers were unhappy with the payments they were receiving for their crops. The recent surge in demand for walnuts, combined with the nature of their contracts with Diamond, resulted in them being paid much less than market price for their crops. In order to preserve relations with the growers and ensure a continued supply of product, Diamond needed to pay more money.

59.     However, Diamond was in the middle of the transaction to acquire the Pringles brand from P&G. Diamond was using its own stock as the currency to make the purchase. Further payments to growers realized against the balance sheets for the fiscal year ending on July 31, 2011 would negatively impact Diamond's share price, thereby potentially jeopardizing the acquisition.

CLASS ACTION COMPLAINT

60.     Accordingly, Diamond settled on the simple expedient of asserting Momentum Payments for the 2010 crop were advance payments for the 2011 crop, despite the fact that Diamond made Momentum Payments to growers who were not even selling their 2011 crop to the Company.

**The Truth Begins to Come Out and Diamond's Share Price Falls**

61.     On November 1, 2011, the Company issued a press release that stated:

> Diamond Foods, Inc. (NASDAQ: DMND) today announced that its previously announced acquisition of the Pringles snack business from The Procter & Gamble Company ("P&G") is now expected to close in the first half of calendar 2012. Diamond and P&G had previously expected the closing to occur in December of 2011.
>
> Diamond and P&G have revised the expected closing date of the acquisition following the receipt by the Chairman of the Audit Committee of Diamond's Board of Directors of an external communication regarding Diamond's accounting for certain crop payments to walnut growers. In response to the communication, Diamond's Audit Committee decided to perform an investigation of this matter. Management is fully committed to supporting the Audit Committee in this process.
>
> Closing of the Pringles transaction remains subject to customary closing conditions and completion of an exchange offer by P&G. Antitrust approvals required for the transaction have already been obtained.

62.     The following day, the Company's share price plummeted 17.8%, closing at 52.76.  By the end of the trading week, Diamonds shares fallen to $46.32, a 26.8% drop from the pre-announcement price.

63.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period were as follows:

(a) Diamond Foods' estimation of the ultimate price to be paid to walnut growers was artificially low;

(b) Diamond Foods' statements regarding the timeline for the purchase of P&G's Pringles line lacked a reasonable basis;

17

(c) Diamond needed to pay walnut growers approximately $50 million over and above the payments made through August 2011;

(d) Because of the impending acquisition of Pringles, among other reasons, Diamond did not want to realize the $50 million as an expense for the fiscal year ending July 31, 2011;

(e) The Company sought to avoid realizing the unwanted expense by styling the $50 million as Momentum Payments for the 2011 crop, despite the fact that the payments were, in truth, for the 2010 crop; and

(f) Diamond Foods' financial results were overstated and false and misleading.

## LOSS CAUSATION

64.     As a result of Defendants' false statements, Diamond common stock traded at artificially inflated levels during the Class Period.  However, after the above revelations seeped into the market, investors sold the Company's shares, causing the shares to drop significantly from their Class Period high.

65.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Diamond common stock, and operated as a fraud or deceit on Class Period purchasers of Diamond common stock by misrepresenting the Company's accounting for payments to walnut growers. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Diamond common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Diamond Foods common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

//

### SCIENTER

66.     During the Class Period, Defendants had both the motive and opportunity to commit fraud. Defendants also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above. In so doing, Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Diamond common stock during the Class Period.

### NO SAFE HARBOR

67.     Diamond's "Safe Harbor" warnings accompanying its forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

68.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Diamond who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

69.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

> (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiffs and other members of the Class purchased Diamond common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

70.     At all relevant times, the markets for Diamond common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, Diamond filed periodic public reports with the SEC;

(b)     Diamond regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Diamond Foods common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "DMND."

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

71.     Plaintiffs incorporate the foregoing paragraphs by reference.

CLASS ACTION COMPLAINT

72.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

      (a)     employed devices, schemes, and artifices to defraud;

      (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Diamond common stock during the Class Period.

74.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Diamond common stock.  Plaintiffs and the Class would not have purchased Diamond common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

75.     The other members of the Class suffered damages in connection with their purchases of Diamond common stock during the Class Period.

## COUNT II

## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

76.     Plaintiffs incorporate the foregoing paragraphs by reference.

77.     The Individual Defendants acted as controlling persons of Diamond within the meaning of Section 20(a) of the Exchange Act.  By virtue of their power to control public statements about

CLASS ACTION COMPLAINT

Diamond, the Individual Defendants had the power and authority to control Diamond Foods and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action, certifying Plaintiffs as a Class representative pursuant to Fed. R. Civ. P. 23, and certifying their counsel as Class counsel;

B.    Awarding Plaintiffs and the members of the Class damages, interest and costs;

C.    Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 9, 2011

FINKELSTEIN THOMPSON LLP

Mark Punzalan
100 Bush St., Suite 1450
San Francisco, CA 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

L. Kendall Satterfield
Michael G. McLellan
Robert O. Wilson
Finkelstein Thompson LLP
James Place
1077 30th Street, NW
Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

CLASS ACTION COMPLAINT